**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**
**VALDOSTA DIVISION**

| | | |
|---|---|---|
| **GIBBS PATRICK FARMS, INC.,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| | : | **7:06-cv-48 (HL)** |
| **v.** | : | |
| | : | |
| **SYNGENTA SEEDS, INC. AND R.D.** | : | |
| **CLIFTON CO., INC. d/b/a CLIFTON** | : | |
| **SEED COMPANY GEORGIA,** | : | |
| | : | |
| **Defendants.** | : | |
| | : | |

# <u>ORDER</u>

## I. INTRODUCTION

In the fall planting season of 2004, disease struck the crops on Gibbs Patrick

Farms ("GPF"), Lewis Taylor Farms, LTF Greenhouses ("LTF" collectively), and

DL&B Enterprises ("DL&B"). In this litigation, and in a companion case also filed in

this Court,[1] the Parties attempt to assign liability for the economic damage that this

incidence of disease caused. At the core of the dispute is a crop common to each

farm: a variety of bell pepper plant called "Stiletto." Syngenta Seeds, Inc.

("Syngenta") produced the Stiletto seeds at issue, and R.D. Clifton Seed Company,

d/b/a/ Clifton Seed Co., Georgia ("Clifton") distributed them.

The farmers assert that their crops suffered from bacterial leaf spot ("BLS"), which

---

[1]<u>Florists' Mutual Insurance Company v. Lewis Taylor Farms, Inc. et al.</u>, 7:05-cv-50.

is caused by a bacterium called *X. campestris* pv. *vesicatoria* ("XCV"). They further claim that the Stiletto seeds carried XCV and therefore were the cause of the BLS outbreak on their farms. They seek damages associated with the destruction of their crops and lost profits.

Before the Court are Plaintiff's Partial Motion for Summary Judgment (Doc. 46), Motions for Summary Judgment on behalf of Syngenta (Doc. 61) and Clifton (Doc. 63), and a joint Motion in Limine on behalf of both Defendants (Doc. 65). For the reasons set out below, Syngenta's Motion for Summary Judgment (Doc. 61) is granted, and Clifton's Motion for Summary Judgment (Doc. 63) is rendered moot in part and denied in part. The Motion in Limine (Doc. 65) is denied, and Plaintiff's Motion for Partial Summary Judgment (Doc. 46) is rendered moot in part, granted in part, and denied in part.

## II. FACTS

### A. The Seed Purchase

Gibbs Patrick Jr. is the president of GPF, a corporation which, during the time relevant to the current dispute, grew produce for commercial sale. Patrick purchased Stiletto seed for GPF from Clifton for the fall 2004 season. He ordered the seed from George Ponder, one of Clifton's sales representatives. The men finalized the sale verbally, discussing only the variety of seed ordered, the number of units, approximate delivery, and price. Ponder agreed on behalf of Clifton to sell the seed and Patrick agreed to buy them during this conversation. There was no

discussion about a disclaimer or limitation of liability, and Ponder was not authorized

to negotiate these terms.

Syngenta packaged the seeds in sealed, labeled cans. Clifton purchased a

complete product from Syngenta and resold it to GPF without breaking the seal on

the containers. Although the cans contained no disclaimer provision on the outside

of the label or any reference to a disclaimer or limit on liability, the label advised the

reader to "open for additional information." Ponder Dep. 44:10-11. Inside the fold-

out label was a disclaimer of warranties and limitation on liability:

> NOTICE TO BUYER: Syngenta Seeds, Inc. warrants that all seed sold has been labeled as required under applicable state and federal seed law and that the seed conforms to the label description within recognized tolerances. THIS WARRANTY IS IN LIEU OF ALL OTHER WARRANTIES, EXPRESSED OR IMPLIED, INCLUDING WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE. THERE ARE NO WARRANTIES THAT EXTEND BEYOND THE DESCRIPTION ON THE LABEL. BUYER'S EXCLUSIVE REMEDY FOR ANY CLAIM OR LOSS RESULTING FROM BREACH OF WARRANTY, BREACH OF CONTRACT, OR NEGLIGENCE (WHICH SHALL NOT EXTEND TO INCIDENTAL OR CONSEQUENTIAL DAMAGES) SHALL BE LIMITED TO REPAYMENT OF THE PURCHASE PRICE.
>
> IMPORTANT NOTICE REGARDING SEED BORNE DISEASES
>
> Syngenta Seeds, Inc. has undertaken all reasonable precautions to identify and control seed borne pathogens on this seed. However, these precautions, which may include seed treatments cannot assure complete absence of seed borne diseases, especially if the disease is

> already present in the buyer's field or neighboring fields
> diseased from other sources. SYNGENTA SEEDS, INC.
> DISCLAIMS ALL WARRANTIES REGARDING SEED
> BORNE DISEASES, EITHER EXPRESSED OR IMPLIED,
> OTHER THAN THE WARRANTIES SET FORTH
> HEREIN. Please contact Syngenta Seeds if you would
> like to receive a more detailed description of the risk from
> seed borne diseases.

Defs.'s Statement of Undisputed Material Facts (Doc. 69) ¶ 25.

Although Patrick had purchased Stiletto and other varieties of Syngenta seed for GPF in the past, he had never read the fold-out portion of the label. Clifton did not provide any additional disclaimer or liability limitation information as a part of its sale to GPF.

## B. The Discovery of BLS

In mid-June 2004, LTF noticed symptoms of disease in the bell pepper seedlings in Greenhouse 25. Greenhouse 25 contained seedlings from Stiletto green peppers, jalapeno peppers, and several varieties of tomatoes. Lewis Taylor Farms provided samples of pepper and tomato transplants to the University of Georgia ("UGA") Cooperative extension Service Disease Clinic for assessment. The extention program then shipped the samples to Dr. Ron Gitaitis's lab. A routine examination produced colonies of "xanthomonad-like" bacteria from both the tomato and pepper plants, confirming the presence of BLS. Dr. Gitaitis's research indicated, however, that the strain of the bacteria on the peppers was different from the strain found on the tomatoes.

After diagnostic tests confirmed that the plants were infected with BLS, Dr. Gitaitis visited LTF to investigate the source of the inoculum. Dr. Gitaitis inspected a greenhouse containing Stiletto peppers and a field of Hungarian Hot Wax peppers. Upon visually inspecting the peppers, Dr. Gitaitis concluded that the infection on the Hungarian peppers located in the field occurred later in the "life history" of the plants. He came to this conclusions because the symptoms were minor spots as opposed to the extensive blighting that would occur on plants that had BLS from an early stage, and the spots were on the upper canopy instead of at the base of the plant as is typical in cases where BLS has been present earlier.

Dr. Gitaitis found no evidence that the Hungarian peppers were the source of the inoculum for the Stiletto peppers in the greenhouse. On the contrary, he determined that it was more likely that the Stiletto peppers were the source of the BLS. He based this initial conclusion on: (1) the fact that BLS symptoms were observed while the Stiletto seedlings were young; (2) the visual evidence that BLS was introduced to the Hungarian peppers later in their development in the field; (3) the lack of an "infection gradient"[2] in the greenhouse; and (4) the fact that Greenhouse 25 was the only greenhouse across the street from a field of Hungarian peppers that was infected at the time. Dr. Gitaitis tested samples from his visit to

---

[2]"Infection gradient" refers to the pattern of BLS observed in a population of plants. A random pattern of BLS indicates that there was no point source of inoculum. A concentration of BLS in one area of the greenhouse with a decreasing gradient as the distance from that concentration increased would indicate that the BLS was introduced by a point source as opposed to occurring naturally in the environment.

LTF but could not identify the source of inoculum from those tests nor could he distinguish between the strains in the Hungarian and Stiletto peppers.

Dr. Gitaitis's lab then learned of a BLS outbreak in Stilleto peppers on GPF. Isolations from these peppers were tested to confirm that the plants were in fact infected with BLS.  Dr. Gitaitis also performed a procedure called repPCR, which confirmed that the strains of BLS in Stiletto peppers from LTF and GPF and Hungarian peppers from LTF were identical, which indicated that the same strain was involved in all three outbreaks.  In contrast, peppers from different sources in Georgia that were infected with BLS were found to have different strains of the bacteria.  These findings made Dr. Gitaitis suspicious that the strain was seedborne as opposed to being present in the environment.

Dr. Gitaitis then performed a race type analysis on samples of infected Stiletto peppers from different sources.  The results indicated that all of the Stiletto peppers were infected with the same race of the BLS strain, another factor which indicated that the source of the bacteria was the seeds themselves.

After this testing, Dr. Gitaitis learned that GPF possessed some unopened cans of the Stiletto seeds it had purchased from Clifton.  Using these seeds, Dr. Gitaitis was able to test his theory that the disease was seedborne.  The cans were transported to his lab unopened and remained in that condition until the time the tests were performed.

### C.  The Grow-Out Test

Bell peppers have a relatively low level of profitability, which has caused a general dearth of research about disease that affects them.  As a result of this lack of research, no industry standard exists for testing whether bell pepper seeds are infected with BLS.  In addition, there is no published data that addresses the sensitivity of any method  for detecting XCV.  Instead, researchers must adapt processes that were developed for use on other plants to detect other kinds of bacteria.  Both Defendants' and Plaintiff's experts adapted other methodologies when designing their tests.  Dr. Gitaitis chose to perform a "grow-out test," which involves planting the seedlings, allowing them to grow, observing visual signs of the presence of the disease, and then testing any visible legions to determine whether BLS is present.  The grow-out test that Dr. Gitaitis designed was modeled after "sweat box" and "dome" tests, which are used to detect watermelon fruit blotch and halo blight of bean respectively.

Dr. Gitaitis and his assistant, Floyd Hunt Sanders Jr., took precautions during the testing to prevent contamination of the seeds from other sources.  The seeds were planted in disposable aluminum trays newly purchased off the shelf from Wal-Mart and were sealed in plastic wrap until the time of use.  A new, unopened bag of potting mix was used for planting.  All work was done in an area that had never been exposed to peppers, BLS, or the bacteria that causes BLS.  Dr. Gitaitis arranged to perform the grow-out in a building called the Head House, which was over 300 yards away from his bacteriology lab, in order to ensure that bacteria from the lab did not

enter the environment of the grow-out.  The Head House had never been used to conduct bacterial research and had never contained peppers or tomatoes.

Sanders opened the cans of seeds using a can opener that had never been exposed to the bacteriology lab.  Approximately 1,000 seeds were planted in each tray.  Sanders weighed the seeds in sterilized beakers and poured them into the newly opened trays.  He did this without using utensils so that the contact the seeds had with other surfaces was minimized.  Potting soil and water were added, and the plastic tops that came with the trays were snapped into place to prevent air movement, reduce the possibility of contamination, and maintain a high degree of humidity inside the trays.  The tops allowed the containers to remain sealed for two weeks before they were opened for watering.

Each growth chamber in the Head House had space for four trays of seeds.  Although the researchers initially planned to use three chambers for a total of twelve trays, after planting the seeds in trays they discovered that only two growth chambers were available in a location sufficiently far enough away from the bacteriology lab.  The tests therefore were limited to the two growth chambers with four trays in each, i.e., approximately 8,000 seeds.

Once the seedlings began to grow, Sanders frequently pulled samples from the trays because there was a lot of spotting on the cotyledons.[3]  As part of the effort

---

[3]A cotyledons is the seed leaf contained within the embryo of the seed that appears above ground during the embryo stage.

to prevent contamination by secondary bacteria, samples were pulled as soon as legions appeared. In addition, Sanders wore latex gloves at all times when he handled the trays and samples. Dr. Gitaitis collected 65 suspected legions from cotyledons and 35 suspected legions from first true leaves. Isolations from these legions were made in a standard fashion: lesions were aseptically cut with a sterile blade, the tissue was minced in a sterile buffer, the sample was allowed to rest during which time the bacteria could swim out into the solution, and a sterile bacteriological loop was used to plate a loopful of bacteria onto the surface of a sterile petri dish containing nutrient ager. This entire process was performed under a laminar flow hood, a device that prevents contamination. The plates were then incubated in a covered incubator.

None of the cotyledon samples produced XCV; four strains were isolated from the true leaf samples, however.[4] These strains were confirmed as having the same DNA fingerprint and being of the same race as the strains in the Stiletto peppers from LTF and GPF. Based on the above observations, Dr. Gitaitis concluded that the seedlot he tested and the seedlot from LTF were the source of the inoculum of the BLS epidemic observed at the two farms.

### C. Dr. Gitaitis's Qualifications

Dr. Gitaitis holds a Ph.D. in Plant Pathology and serves as a professor of plant

---

[4]Dr. Gitaitis speculated that the reason XCV was not detected in the cotyledons was that the presence of other bacteria could have initially masked the XCV.

pathology for the University of Georgia. He has thirty-two years experience in researching the ecology of bacterial plant pathogens and the diseases that they cause. This background includes extensive experience researching epidemiology of bacterial diseases in vegetables produced in southern Georgia. Dr. Gitaitis developed several techniques that have "advanced and improved the ability to diagnose bacterial diseases of vegetables . . . including techniques that are designed to detect pathogens in seeds. . ." Pl.'s Resp. Mot. Limine Ex. A at 3.

Dr. Gitaitis's experience with diagnosing bacterial pathogens in pepper seeds and plants includes his diagnosis of "all bacterial-like symptoms of tomato and pepper transplants grown as Georgia certified from 1980-1995;" contributions to the Georgia Department of Agriculture's efforts to identify bacteria in pepper seeds in its seed certification program; and evaluation for a commercial seed company of seedlots for BLS. Id.

## III. SUMMARY JUDGMENT

Both Defendants have filed Motions for Summary Judgment, and Plaintiff has moved for partial summary judgment on some of the defenses that the Defendants have asserted. In response to Clifton's Motion, Plaintiff has withdrawn its strict liability claim against that Defendant. Clifton's Motion is therefore moot with regard to Count II. Two counts remain in this case: Count I for breach of implied warranty against Clifton, and Count III for strict liability against Syngenta.

10

**A. Standard**

Summary judgment is appropriate when there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). In ruling on a defendant's motion for summary judgment, the court takes the facts in the light most favorable to the plaintiff. <u>Stanley v. City of Dalton</u>, 219 F.3d 1280, 1287 (11th Cir. 2000). The initial burden lies on the movant to demonstrate that the nonmovant lacks evidence to support an essential element of its claim. <u>Lowe v. Aldridge</u>, 958 F.2d 1565, 1569 (11th Cir. 1992). The burden then shifts to the nonmovant, who must come forward with some evidence that would allow a jury to find in his favor, even if the parties dispute that evidence. <u>Id.</u> If the evidence that the nonmovant presents, however, is "merely colorable" or "not significantly probative," then summary judgment may be granted. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249 (1986).

**B.  Strict Liability Claim**

GPF asserted a claim for strict liability against Syngenta in Count III of the Complaint. After reviewing the motions for summary judgment in this case, the Court ordered the Parties to file supplemental briefs on what appeared to be a fundamental problem with this claim. As the Court noted in its February 22, 2008 Order (Doc. 97), Georgia law, which applies in the present case, only allows strict liability claims when they are brought by natural persons. GPF, the only plaintiff in this action, is not a natural person under Georgia law. In its supplemental briefings

11

on this issue, both Parties agreed with the Court's conclusion.  See Pl.'s Brief (Doc. 98) at 2; Def.'s Brief (Doc. 99) at 1.  GPF's strict liability action is therefore dismissed.  Nonetheless, GPF asserts that it has sufficiently pled a cause of action against Syngenta for negligent manufacture in its Complaint.  As explained below, the Court finds it has not.

### C. Negligent Manufacturing Claim

Notably, the supplemental brief that GPF submitted in response to the Court's February 22, 2008 Order represents the very first time GPF has argued that its Complaint properly pled a cause of action for negligence against Syngenta.   It is obvious from the record before the Court that GPF's position is a new one, asserted in a last-ditch effort to rescue its case against Syngenta.

Under the Federal Rules of Civil Procedure, a plaintiff's complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a).  The United States Supreme Court recently tweaked its prior articulation of this standard in Bell Atlantic Corp. v. Twombly,  127 S. Ct. 1955, 1968 (2007) and Erickson v. Pardus. 127 S. Ct. 2197, 2200 (2007).  Prior to these decisions, Conley v. Gibson provided the pleading standard under Rule 8(a): "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."  355 U.S. 41, 45-46 (1957).  The Twombly Court, however, rejected the "no set of facts" language as an incomplete statement of the

12

standard.  <u>Twombly</u>, 127 S. Ct. at 1969.

As the Court explained in <u>Twombly</u>, the complaint must contain some factual allegations in order to provide " 'fair notice' of the nature of the claim" and the " 'grounds' on which the claim rests."  <u>Twombly</u>, 127 S. Ct. at 1965 n.3 (quoting 5 Wright & Miller § 1202, at 94, 95).  These allegations must raise the possibility of relief above a speculative level and provide grounds to infer the elements of the cause of action.  <u>See</u> <u>Twombly</u>, 127 S. Ct. at 1965 (discussing requirement in context of conspiracy claim).  In effect, <u>Twombly</u> created a "plausibility standard" under which the plaintiff must allege "enough facts to suggest, raise a reasonable expectation of, and render plausible" the elements of the claim.  <u>Watts v. Fl. Int'l Univ.</u>, 495 F.3d 1289, 1296 (2007) (applying <u>Twombly</u>).

Plaintiff has failed to put Syngenta on notice that it was defending itself against a negligent manufacturing claim.  Count III in the Complaint, which is the only count asserted against Syngenta, is titled, "PATRICK FARMS CLAIMS FOR STRICT LIABILITY AGAINST SYNGENTA." Compl. at 9.  Count III charges Syngenta with placing Stiletto bell pepper in the stream of commerce "in a defective, unreasonably dangerous condition." Compl. ¶ 36.  There is no mention of duty, breach, negligence or a specific negligent act.  The Complaint therefore fails to suggest that Plaintiff had a cause of action sounding in negligence.

Plaintiff argues that this is immaterial because of the similarities between negligent manufacturing and product liability cases.  Although the same risk-utility

analysis applies to both design defect[5] and negligence causes of action, <u>ICI Ams.</u>, 450 S.E.2d at 672, that does not render the pleading requirements the same for both theories of liability. Furthermore, Syngenta could still be prejudiced by having to defend against a newly asserted negligence claim. The Complaint gives Syngenta fair notice of the strict liability claim, but does not give fair notice of the negligence claim.

The progress of the litigation in this case also demonstrates the failure of Count III to provide notice of a negligence claim. Syngenta's Motion for Summary Judgment in this case argued vigorously that GPF could not bring a claim for strict liability against it because the two Parties were not in privity with each other. In its Response, GPF argued only the merits of the privity defense; it made no mention that even if the Court granted Syngenta's Motion for Summary Judgment on the strict liability claim, the single count against Syngenta could not be dismissed because a negligence claim would remain pending against the Defendant.

---

[5]Regardless, the similarities between proving negligence and *design* defect may be irrelevant in this case because the facts of this case more closely resemble a *manufacturing* defect claim. In a manufacturing defect claim the product is assumed safe, but the production process resulted in the particular product at issue being unsafe. <u>Bank v. ICI Ams., Inc.</u>, 450 S.E.2d 671, 672 (Ga. 1994). Design defect cases, on the contrary, are those in which an "entire product line may be called into question and there is typically no readily ascertainable external measure of defectiveness." <u>Id.</u> at 672-73. It is unlikely that Plaintiff is arguing that bell pepper seeds are unreasonably dangerous as a general proposition; rather it appears its position is that the lots of seeds in this case were exposed to XCV during the production process. In addition, the measure of defectiveness is easily ascertainable: a bell pepper seed that does not carry XCV. Plaintiff's contention that the similarities between design defect and negligent manufacturing claims render them indistinguishable is therefore especially unpersuasive because the design defect risk-utility analysis does not apply under the facts of this case.

In addition, under this district's local rules, "[a]ll material facts contained in the moving party's statement which are not specifically controverted by the respondent in respondent's statement shall be deemed to have been admitted, unless otherwise inappropriate." Local Rule 56. Syngenta's Statement of Material Facts states "Gibbs Patrick Farms, Inc. alleges a single cause of action against Syngenta sounding in strict liability." Statement Mat. Facts ¶ 3. GPF's Statement of Facts does not contest Syngenta's assertion that the only claim against it is for strict liability. It is appropriate to deem this fact admitted because the other evidence cited above indicates in reality it was true.

The Court rejects GPF's contention that it has properly pleaded a cause of action for negligent manufacturing, and declines to allow Plaintiff to change course at this late stage of the litigation to argue a new cause of action against a Defendant who had understandably not anticipated it. Count III, which is the only count asserted against Syngenta, is therefore dismissed.

### D. Breach of Warranty Claim

GPF asserts a claim for breach of warranty against Clifton. Clifton has moved for summary judgment on this claim, asserting that the disclaimer on the seed containers effectively disclaimed any implied warranty and that the limitation of remedies clause prohibits GPF from recovering more than the cost of the seeds. GPF has also moved for partial summary judgment on Clifton's defenses of disclaimer and limitation of remedies. The Court finds, however, that no disclaimer

or limitation of liability were applicable to Clifton.  Furthermore, the application of a disclaimer or limitation of liability in this case would be unconscionable under Georgia law.  These provisions therefore provide no protection to Clifton.  Clifton's Motion for Summary Judgment is thus denied and Plaintiff's Motion for Partial Summary Judgment is granted on this issue.

### 1.  Applicability of the Written Warranty to Clifton

Clifton argues that in its prior course of dealing with GPF it has always "passed on" the disclaimer on the Syngenta seed cans to GPF, and that the disclaimer and limitation of liability on the cans were part of the Parties' contract.[6] The Court holds, however, that regardless of the prior course of dealing, the disclaimer language applies only to Syngenta.  The written provisions on the seed cans therefore do not affect Clifton's liability for breach of an implied warranty.

Under Georgia law, the implied warranty of merchantability may be excluded if the disclaimer mentions merchantability and, in the case of a writing, is conspicuous.  O.C.G.A. § 11-2-316(2).  However, "a manufacturer's disclaimer of warranties does not run with the goods so as to protect any subsequent seller of them; thus, each subsequent seller must make his own independent disclaimer in order to be protected from warranty liability."  63 Am. Jur. Prods. L. § 801; see also

---

[6]Clifton also contends that the disclaimer and limitations of liability are valid because they were conspicuous as required under O.C.G.A. § 11-1-201.  Whether they were conspicuous, however, is irrelevant if they were never a part of the contract in the first place.  See, e.g., Bowdoin v.Showell Growers, Inc., 817 F.2d 1543, 1546-47 (11th Cir. 1987) ("the conspicuousness of a post-sale disclaimer is immaterial").

Clark v. DeLaval Separator Corp., 639 F.2d 1320, 1324 (5th Cir. 1981) (finding that seller's disclaimer was ineffective as to manufacturer); Graham Hydraulic Power, Inc. v. Stewart & Stevenson Power, Inc., 797 P.2d 835, 839 (Colo. App. 1990) ("each subsequent seller must make his own independent disclaimer in order to be protected from warranty liability"); Barazotto v. Intelligent Systs., Inc., 532 N.E.2d 148, 149 (Ohio App. 1987) (""[T]he manufacturer's disclaimer of warranties does not run with the goods so as to protect any subsequent seller of them. To the contrary, each subsequent seller must make his own independent disclaimer in order to be protected from warranty liability."); The Law of Product Warranties § 8:14 (November 2007) ("In the usual case, a distributor or dealer must make his own disclaimer in order to be free from implied warranty liability. He cannot rely on a disclaimer used by the manufacturer even though he passes that documentation on to the ultimate buyer.").

A seller is shielded by a manufacturer's disclaimer when it provides a written disclaimer to the buyer independent of the materials that the manufacturer provides. Graham Hydraulic Power, Inc., 797 P.2d at 839. Where the language of the disclaimer explicitly applies to the manufacturer, however, it will not effectively disclaim implied warranties that apply to the seller. See, e.g., Stephens v. Crittenden Tractor, Co., 370 S.E.2d 757, 761 (Ga. App. 1988) (holding that a limitations clause that applied to the manufacturer was not effective as to the dealer). In Stephens, for example, the Georgia Court of Appeals held that the following

language limited liability for the manufacturer, but not the dealer who sold the product: "The Company's liability, whether in contract or in tort, arising out of warranties, representations, instructions, or defects from any cause shall be limited exclusively to repairing or replacing parts . . . in no event will the Company be liable for consequential damages . . . " Stephens, 370 S.E.2d at 761. The Stephens court looked to the language of the manufacturer's limitation of liability to determine whether it applied to the dealer. Id.; see also Chem Tech Finishers, Inc. v. Paul Mueller Co., 375 S.E.2d 881, 883 (Ga. App. 1988) (using the plain language of the contract to determine to what products the warranty limitation applied). The contract contained explicit reference to both the manufacturer and the dealer, yet by its terms the limitation clause in the contract applied only to the manufacturer. Stephens, 370 S.E.2d at 761. The court therefore concluded that the limitation did not protect the dealer. Id.

The disclaimer on the Stiletto seed container that addresses seed borne illnesses specifically states: "SYNGENTA SEEDS, INC. DISCLAIMS ALL WARRANTIES REGARDING SEED BORNE DISEASES, EITHER EXPRESSED OR IMPLIED, OTHER THAN THE WARRANTIES SET FORTH HEREIN." The general disclaimer also refers specifically to Syngenta:

> Syngenta Seeds, Inc. warrants that all seed sold has been labeled as required under applicable state and federal seed law and that the seed conforms to the label description within recognized tolerances. THIS WARRANTY IS IN LIEU OF ALL OTHER WARRANTIES,

EXPRESSED OR IMPLIED, INCLUDING WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE. THERE ARE NO WARRANTIES THAT EXTEND BEYOND THE DESCRIPTION OF THIS LABEL. BUYER'S EXCLUSIVE REMEDY FOR ANY CLAIM OR LOSS RESULTING FROM BREACH OF WARRANTY . . . SHALL BE LIMITED TO REPAYMENT OF THE PURCHASE PRICE.

The disclaimer against seed borne illness, which is the subject of the dispute in this case, is explicitly made on Syngenta's behalf and makes no mention of dealers or secondary sellers. Even the general disclaimer and limitation of liability deal only with Syngenta. After Syngenta expressly warrants the information on the seed label, it expressly disclaims its liability for other warranties. Like the contract language in Stephens, the seed label in this case refers to the producer specifically instead of to a generic "seller." As a result, the disclaimer and limitations apply only to Syngenta, instead of applying to any seller of the product. In addition, like the dealer in Stephens, Clifton made no independent disclaimer of warranty, which it could have done by including a disclaimer in a sales contract, for example. Even if GPF had read and been aware of the terms on the seed labels, it would still not have known that Clifton, as opposed to Syngenta, had disclaimed all warranties. Applying the plain-language approach that the Georgia Court of Appeals took in Stephens, the Court finds that neither the disclaimer nor the liability limitation apply to Clifton by their terms. Therefore, under Georgia law, the terms of the disclaimer and the limitation of liability do not apply to Clifton and were not incorporated as a term of the

contract between Clifton and Lewis Taylor Farms.

## 2.  Disclaimer or Limitation of Liability by Usage of Trade

"A usage of trade is any practice or method of dealing having such regularity of observance in a place, vocation, or trade as to justify an expectation that it will be observed with respect to the transaction in question."  O.C.G.A. § 11-1-205(2).  The usage of trade concept allows the commercial context in which the parties operate to supplement the terms of the contract.  U.C.C. cmt. 1.  The existence of the custom or usage of trade and its scope are issues of fact, Ga. Timberlands, Inc. v. So. Airways Co., 188 S.E.2d 108 (Ga. App. 1972), and the party asserting the usage of trade bears the burden of proving it.  All Angles Const. & Demolition, Inc. v. Metropolitan Atlanta Rapid Tranit Auth., 539 S.E.2d 108 (Ga. App. 1972).  "To make a usage and custom of trade binding, it must be known, certain, uniform, reasonable, and not contrary to law."  Citizens & So. Bank v. Union Warehouse & Compress Co., 122 S.E. 327 (Ga. 1924).

If seed merchants disclaimed warranties and limited liability with such regularity that it became a usage of trade, a disclaimer or limit on liability would have become a part of the contract.[7]  In support of its usage of trade argument, Clifton presents evidence of the label of a seed container of Seminis seeds, which disclaims

---

[7]Clifton frames the issue as whether the printed disclaimer and remedy limitation on the seed containers were incorporated into its contract with Lewis Taylor Farms by a usage of trade.  The Court has held, however, that the terms of the disclaimer do not apply to Clifton, and therefore even if this term was part of the contract it would not affect Clifton's liability.

liability both for the seller and the manufacturer of the seed; an example of the disclaimer used on seed containers by seed producer Harris Moran, which disclaims liability only for itself; a disclaimer placed on the back of an order form of seed producer Abbott & Cobb; and an affidavit of the president of seed distributor Siegers Seed Company, which states that Siegers "passed on to Gibbs Patrick Farms, Inc. the disclaimer of warranty and limitation of liability on the seed container of those seeds." Doc. 69-14 at 3.

Clifton has failed to present evidence, however, that seed distributors regularly passed on seed manufacturers' disclaimers or that those disclaimers were typically effective against both the manufacturer and distributor. The only evidence from a seed distributor other than Clifton was from the president of Siegers Seed company. His testimony, however, says nothing about passing on disclaimers or limitations of liability to any other seed purchaser except Gibbs Patrick Farms; a usage of trade cannot be established by one company's course of dealing with one other company.

In addition, even if there was enough to show usage of trade for passing on disclaimers, the evidence does not support a finding that those disclaimers were universally effective to protect seed distributors. The Harris Moran disclaimer explicitly applies only to the manufacturer, not the seller, and it thus does not establish a usage of trade with regard to disclaimers by distributors of seed. The Abbott & Cobb disclaimer appeared only on the back of a order form, therefore a farmer purchasing seed through a distributor (instead of directly from producer

21

Abbott & Cobb) would have never even seen this disclaimer. The Seminis seed container, which contains provisions disclaiming liability for both the manufacturer and seller, is the only evidence of any label that would be effective to disclaim or limit liability for seed distributors. Nonetheless, Clifton has failed to create a material issue of fact regarding a usage of trade because a reasonable factfinder could not conclude that Clifton carried its burden to establish that a universal usage of trade existed from this solitary piece of evidence, especially when that evidence is contradicted by other disclaimers that would not protect seed distributors. The Court therefore holds that neither a disclaimer nor a limitation of liability became a part of the contract between Clifton and GPF through a usage of trade. But, even if this Court did find that a disclaimer or limitation of liability protecting Clifton was part of the contract, for the reasons set out below, it would be unconscionable under Georgia law.

### 3. Unconscionability of the Warranty

#### (i) Standard

Georgia law permits a court to refuse to enforce a contract or provision thereof if it finds that any clause of the contract was unconscionable at the time the contract was made. O.C.G.A. § 11-3-302 (2002). Unconscionability "is not a concept, but a determination to be made in light of a variety of factors not unifiable into a formula." NEC Techs., Inc. v. Nelson, 478 S.E.2d 769, 771 (Ga. 1996) (citations and quotation omitted). The unconscionability analysis consists of a two-pronged inquiry into both

the procedural and substantive unconscionability of the clause. Id. at 773.

> Procedural unconscionability addresses the process of making the contract, while substantive unconscionability looks to the contractual terms themselves. A non-inclusive list of some factors courts have considered in determining whether a contract is procedurally unconscionable includes the age, education, intelligence, business acumen and experience of the parties, their relative bargaining power, the conspicuousness and comprehensibility of the contract language, the oppressiveness of the terms, and the presence or absence of a meaningful choice. As to the substantive element of unconscionability, courts have focused on matters such as the commercial reasonableness of the contract terms, the purpose and effect of the terms, the allocation of the risks between the parties, and similar public policy concerns.

Id. at 771-72. Although the limitation of consequential damages for commercial loss is not prima facie unconscionable, id. at 771 n.1,[8] the Court finds that the disclaimer and limitation in this case are unconscionable.

The Georgia Court of Appeals addressed a set of facts similar to those in this case in Mullis v. Speight Seed Farms, Inc., 505 S.E.2d 818 (Ga. App. 1999). A commercial farmer brought suit against a seed manufacturer for damages it incurred when only fifteen percent of the seed it purchased produced visible plants. Id. at

---

[8]Clifton cites Lee v. Mercedes-Benz USA, LLC, 622 S.E.2d 361 (Ga. App. 2005), for the proposition that "limitation of liability in commercial transactions are enforceable as a matter of law." Def.'s Reply (Doc. 90) at 8. Lee simply states, however, that these provisions are not prima facie unconscionable. Lee, 622 S.E.2d at 362. It does not follow that they are per se enforceable. In fact, the Lee court engaged in a fact-specific analysis of whether the limitation was unconscionable in that case. Id.

819.  No discussion regarding a warranty or limitation of liability occurred before the sale of the seeds was finalized.  Id.  The farmer did read the label of the seed can after receiving the seeds; he did not, however, read the disclaimer of liability or limitation of remedy contained on the seed can.  Id.  Furthermore, after receiving the containers with the disclaimer and limitation of remedy on the packaging, he ordered more seed.  Id.  The court held that a disclaimer of warranty and limitation of liability were unconscionable under the facts of the case.  Id. at 822.

In reaching its conclusion, the Mullis court identified both procedural and substantive reasons that the provisions were unconscionable.  First, the court recognized that Georgia law allows sellers to limit their liability to the sales price for items like computers.  Id. at 820.  Such a limitation was inappropriate, however, for agriculture seeds because "a failed crop is not repaired or replaced by the original cost of the seed."  Id.  The value of a computer, for example, is the value of the product itself; the value of a seed is in the plant grown from the seed.  Id.  Realizing this value requires expending "substantial sums of money for bed preparation, fumigation, plastic covering for the seed beds, labor, fertilizer, and irrigation."  Id.

The court found the following facts demonstrated procedural unconscionability: the plaintiff was a farmer and not a professional seed merchant; the seed purchase occurred over the phone during a discussion involving only seed variety and price; the seed company did not negotiate warranty provisions with its customers; the plaintiff was not in a positions to negotiate more favorable terms or

test the product before the purchase; and the plaintiff was not aware of the disclaimer or limitation of remedies.  Id. at 821.

There was also evidence of substantive unconsionability: seed manufacturers were in a better position to shoulder the risk of defective seeds because they could test the seeds and allocate the cost of testing among all consumers and farmers could not; a farmer does not know about a defect in a seed until a large amount of money has been spent; and replacement and repair are not adequate recourse for a farmer's lost profit and expenditures.  Id. As such, both the disclaimer and limitation of remedies were unconscionable as a matter of law.  Id. at 822.

(ii)  Analysis

The Mullis's courts analysis of substantive unconscionability applies with equal force in the present case.  As a matter of policy, seed manufacturers and sellers are better able to spread the risk of defective seeds and engage in testing to ensure quality.  In addition, like the farmer in Mullis, GPF had to spend large amounts of money before discovering that the seed was defective and its losses would not be adequately addressed by the replacement cost of the seed.

The indicators of procedural unconscionability the court found in Mullis are also present in this case.  GPF is a farming company, not a seed merchant.[9]  When

_____

[9]Clifton argues vigorously that Mullis can be distinguished from the present case because GPF is a large-scale commercial farm.  There is, however, no discussion of the size of the farm in Mullis.  There is therefore no evidence that the two farms were considerably different in size and, regardless, the Mullis court did not identify the size of the farm as a significant factor in its analysis.

Gibbs Patrick placed an order for seeds with Clifton's sales representative George Ponder, the men discussed the variety, amount, price, and approximate delivery date of the seeds. Ponder did not inform Patrick that the seeds were being sold subject to a disclaimer or limitation of remedy, and did not attempt to negotiate the terms of these provisions with Patrick, nor was he authorized to do so. Patrick could not test the seeds before placing his order or accepting delivery, and he was not aware of the disclaimer or limitation when he entered into the contract.

Clifton attempts to distinguish <u>Mullis</u> primarily on the ground that, unlike the farmer in <u>Mullis</u>, GPF was not surprised by the disclaimer or limitation provisions. Specifically, it argues that GPF had constructive knowledge from the usage of trade in the seed industry, which included placing disclaimers on seed containers. It also contends that GPF had notice of the disclaimers from the ongoing course of dealing between Syngenta and GPF, which included previous purchases of Stiletto and other seeds from Syngenta with same or similar disclaimer language. This argument is largely defeated by the Court's finding that the disclaimer did not apply to Clifton and that there was no usage of trade for distributors to disclaim warranties or limit liability. But regardless, the difference in the degree of surprise between the <u>Mullis</u> plaintiff and GPF does not provide a meaningful distinction between the facts of this case and those in <u>Mullis</u>.

Like the farmer in <u>Mullis</u>, GPF had no actual knowledge of the disclaimer and limitation language, and in fact it had a similar degree of constructive knowledge as

26

the Mullis farmer.  Both plaintiffs had read some parts of the label, but not the part containing the disclaimer.  After reading parts of the label, both farmers subsequently ordered more of the same seed.  Therefore the constructive knowledge that a farmer obtains from having access to the seed containers is not dispositive of the issue of procedural unconscionability.  In addition, the disclaimer in the present case was even more difficult to discover: the outside of the label simply stated "open for additional information."  Ponder Dep. 44:6-24.  Only upon opening the label would the consumer discover the warranty disclaimer and limitations statements.  Ponder Dep. 45:13-17.  The notice that GPF had of the written disclaimer was therefore analogous to the notice that the Mullis farmer had, and any differences do not provide grounds for distinguishing these two factually similar cases.[10]

Finally, Clifton points out that other jurisdictions have upheld these kinds of provisions under similar facts.  But unconscionability analysis is largely a matter of policy.  A Georgia appellate court has spoken on this very issue and it is not this Court's position to alter the policy that the state of Georgia, through its judicial branch, has set for itself.  Along these lines, Clifton notes that two of the many cases upon which the Mullis court relied as persuasive authority were legislatively abrogated by the law-making bodies of their respective states.  Interestingly, the

---

[10]Furthermore, as previously noted, the language on the seed containers did not apply to Clifton; therefore even actual knowledge of the provisions would not have been sufficient to dispel GPF's surprise with regard to Clifton's alleged disclaimer and limitation of liability.

Georgia legislature has not taken such a step since the disposition of <u>Mullis</u> in 1996. Although the Georgia Supreme Court or the Georgia General Assembly certainly could reverse the ruling in <u>Mullis</u>, they have not done so and this Court is therefore bound by its precedent.

Because Clifton has failed to demonstrate that it disclaimed the implied warranty of merchantability on the seed it sold to GPF, its Motion for Summary Judgment is denied.[11]  The Court denies Clifton's Motion for Summary Judgment with respect to Count I of the Complaint, and grants Plaintiff's Motion for Partial Summary Judgment with respect to Clifton's First Additional Defense.

### E.  Clifton's Defenses

Plaintiff has moved for partial summary judgment with respect to several of Clifton's asserted defenses.[12]  In ruling on the Plaintiff's Motion, the Court reads the facts in the light most favorable to Clifton, the non-movant.

### 1.  Mitigation of Damages

Georgia law requires a plaintiff to mitigate his damages.  O.C.G.A. § 51-12-11 (2000).  The burden of proof is on the party asserting failure to mitigate damages,

---

[11]Clifton also argued that GPF's expert's testimony should be excluded and, if the court did exclude that evidence, then GPF did not establish a prima facie case of causation.  As the Court discusses *infra*, the expert testimony is admissible and Plaintiffs have therefore established a prima facie case of causation.

[12]Plaintiff also moved for partial summary judgment with respect to Syngenta's defenses.  Those issues are moot, however, because Plaintiff's claim against Syngenta is dismissed.

and the " 'proof must include sufficient data to allow the jury to reasonably estimate how much the damages could have been mitigated.' " <u>Moreland Auto Stop., Inc. v. TSC Leasing Corp.</u>, 454 S.E.2d 626, 628 (Ga. App. 1995) (quoting <u>Cent. Nat'l Ins. Co. of Omaha v. Dixon</u>, 373 S.E.2d 849 (Ga. App. 1988). Clifton points to GPF's decision to transfer infected pepper seedlings to its field instead of destroying the seedlings, which would have limited damages to the loss of the Stiletto bell pepper plants and the cost of finding new bell pepper seedlings to its fall crop. In addition, GPF's expert suggested that a greenhouse operator should discard the contents of a greenhouse when diseased seedlings appeared. A genuine issue of material fact therefore exists regarding whether GPF failed to mitigate its damages as required under Georgia law, or whether its own acts of negligence, omissions, or fault could have caused or contributed to its injuries. The Motion is therefore denied with respect to the Sixth, Seventh, and Twelfth Additional Defenses.

### 2. Alternative Theories of Causation

Clifton has presented evidence that the bacteria that caused the BLS at GPF could have been endemic to the area or exacerbated by the weather. The defense of a superseding or intervening cause is thus an issue of fact for the jury to decide. Plaintiff's Motion for Summary Judgment on the Eighth Additional Defense is therefore denied. Clifton has not, however, pointed to any evidence that a third party caused GPF's injuries or that any party misused, abused, altered, modified or otherwise caused a substantial change in the seeds. The Motion is thus granted

with regard to the Ninth and Eleventh Defense.[13]

The Court cautions the Parties that their Order is not intended to unfairly restrict Clifton's freedom to attack the elements of Plaintiff's claim. The defenses at issue in this case are not the kinds of affirmative defenses that the Federal Rules require be affirmatively pled in an answer. See Fed. R. Civ. P. 8(c). Rather, they are simply more specific denials of elements of Plaintiff's prima facie case. The resolution of Plaintiff's motion assists the Court and the Parties in narrowing the issues for trial; the Defendant will, however, be afforded latitude to argue its defense before the jury as the Court deems just.


## IV.  MOTION IN LIMINE

Clifton challenges the introduction of the expert testimony of Dr. Gitaitis. Dr. Gitaitis's testimony includes his involvement in the initial diagnosis of the problem on the farms, the results of his testing, and his expert opinion that the source of the disease was the Stiletto seeds. The Court finds that Dr. Gitaitis's testimony is admissible and therefore denies Clifton's Motion in Limine.

### A.  Requirements under Rule 702

The testimony of an expert "may be assigned talismanic significance in the

---

[13]The Motion for Summary Judgment on the Tenth Additional Defense is rendered moot because no claim for strict liability remains against Clifton. See Clifton's Response (Doc. 73) at 20 n.15 (maintaining its Tenth Defense only with respect to any remaining strict liability claim).

eyes of lay jurors." <u>United States v. Frazier</u>, 387 F.3d 1244, 1263 (11th Cir. 2004).

It has a potentially powerful and misleading effect because of the difficulty in assessing it. <u>Id.</u> at 1260. The Federal Rules of Evidence therefore require trial courts to act as gatekeepers and analyze the foundations of expert opinions to ensure they meet the admissibility standard of Rule 702. <u>Id.</u> The purpose of this gatekeeping function "is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." <u>Kumho Tire Co., Ltd. v. Carmichael</u>, 526 U.S. 137, 152 (1999).

Under Rule 702, the trial court must engage in a rigorous, three-part inquiry that examines whether the expert is qualified, whether the methodology is sufficiently reliable, and whether the testimony will assist the trier of fact. <u>City of Tuscaloosa v. Harcros Chems., Inc.</u>, 158 F.3d 548, 562 (11th Cir. 1998). The proponent of the expert testimony, in this case the Plaintiff, bears the burden of demonstrating by a preponderance of the evidence that his expert meets these requirements. <u>See</u> <u>Frazier</u>, 387 F.3d at 1260 (placing the burden on the party offering the expert testimony); <u>Daubert</u>, 509 U.S. at 592 n.10 (noting that Federal Rule of Evidence 104(a) requires the trial judge to make a determination of admissibility by a preponderance of the evidence). In the present case, the Court agrees with the Parties that the testimony at issue would be given by an expert who is sufficiently qualified and that it would assist the trier of fact. As noted above, Dr. Gitaitis's

qualifications are extensive.  In addition, his testimony goes to the core issue in the case, i.e., the cause of BLS in the Stiletto peppers at GPF and LTF.  Defendant challenges, however, the admission of Dr. Gitaitis's expert opinion on the ground that it is unreliable.  The Court therefore focuses its inquiry on this prong of the test.

## B. Reliability

In Daubert, the Supreme Court of the United States considered the standard for expert testimony under Rule 702.  After the adoption of the Federal Rules of Evidence, many courts had continued to utilize the "Frye" test when assessing the admissibility of expert testimony.  Daubert, 526 U.S. at 587.  Under that test, expert testimony was only admissible when it was based on a technique that was "generally accepted" as reliable in the scientific community.  Id. at 584.  The Court held that this high bar for admissibility was inconsistent with the liberal approach to discovery in the Federal Rules.  Id. at 589.

In attempt to lower that bar, the Court articulated a standard derived from the language of Rule 702 itself.  Rule 702 in its current form states:

> [i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.  The Court reasoned that in order for an expert's testimony to be

based on "scientific knowledge," the opinion must be "derived by the scientific method." Daubert, 509 U.S. at 590.[14] "In short, the requirement that an expert's testimony pertain to 'scientific knowledge' establishes a standard of evidentiary reliability." Id. At the core of Daubert is the requirement that courts focus "solely on principles and methodology, not on the conclusions that they generate." Id. at 595.

The Daubert Court provided a non-exhaustive list of factors to guide the inquiry into the reliability of expert testimony: (1) whether the methodology can and has been tested, (2) whether the theory or technique has been subjected to peer review and publication, (3) the known potential rate of error and the existence of standards controlling the technique's operation, and (4) whether the theory or methodology has been "generally accepted" by the scientific community. Id. at 592-94. In addition, the Advisory Committee Notes to the Federal Rules provide additional factors that may be useful in assessing reliability:

> (1) Whether experts are "proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying." Daubert v. Merrell Dow Pharmaceuticals, Inc., 43 F.3d 1311, 1317 (9th Cir. 1997).
> (2) Whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion. . . .
> (3) Whether the expert has adequately accounted for obvious alternative explanations. . . .

---

[14]The scientific method is a process for proposing hypotheses and testing them to see if they can be disproved. Daubert, 509 U.S. at 593; U.S. v. Bynum, 3 F.3d 769, 774 (4th Cir. 1993) (defining the scientific method as "subjecting testable hypotheses to the crucible of experiment in an effort to disprove them").

> (4) Whether the expert "is being as careful as he would be in his regular professional work outside his paid litigation consulting." <u>Sheenan v. Daily Racing Form, Inc.</u>, 104 F.3d 940, 942 (7th Cir. 1997). . . .
> (5) Whether the field of expertise claimed by the expert is known to reach reliable results for the type of opinion the expert would give. . . .

Fed. R. Evid. 702 advisory committee's note (2000).

Each step of the expert's analysis must be demonstrated to be reliable; if any step fails the <u>Daubert</u> test, the entire testimony is inadmissible. <u>McClain v. Metabolife Intern., Inc.</u>, 401 F.3d 1233, 1245 (11th Cir. 2005). It is important to note, however, that the reliability test under <u>Daubert</u> is flexible. <u>Daubert</u>, 509 U.S. at 594. The factors may not be relevant in all cases, or it may be appropriate to apply different factors in addition to those listed in <u>Daubert</u>. <u>Kuhmho Tire Co.</u>, 526 U.S. at 141. For example, reliability concerns may be more properly addressed by focusing on the personal knowledge or experience of the expert rather than his methodology. <u>Id.</u> at 150. The trial court has significant discretion to conduct the reliability analysis for expert testimony. <u>Id.</u> at 152.

Plaintiff proposes to offer testimony by Dr. Gitaitis regarding his initial investigation and the grow-out test he performed between October and November 2004. Evaluation of expert testimony on the topic of the cause of BLS in bell pepper plants is difficult, however, because of the lack of research attention and resources

devoted to the detection of disease in these plants.[15] There is, for example, no standard protocol for the detection of BLS in bell peppers. Therefore, although the use of grow-out testing to detect BLS in bell pepper plants has not been subject to publication or peer review, neither has any other method.[16] In addition, there is no published data that addresses the sensitivity or specificity of any method for detecting XCV in bell pepper seeds.[17] It is certainly possible to test the effectiveness of grow-out and seed wash tests for the detection of XCV in bell pepper seeds, but there is no existing research that does so. This is therefore not a case in which the expert is using a rogue methodology instead of a widely accepted, time-tested standard procedure. Although the Court will consider the lack of published data, known rate of error, or standard protocol for the grow-out test, these factors weigh

---

[15]This and other evidence comes from an affidavit by Dr. Jeffery B. Jones. The Court previously granted a Motion to Strike Dr. Jones's testimony due to its untimeliness under Rule 26. This rule, however, only addresses requirements for expert testimony for use *at trial*. Expert testimony that does not comply with this rule is therefore only excluded at trial and may be properly considered in a Daubert determination. See Fed. R. Civ. P. Rule 26.

[16]It appears from the evidence before the Court that the National Seed Health System (NSHS) have a "temporary standard" for the detection of BLS in bell peppers. According to one witness, the standard is adopted from that used to isolate black rot on crucifiers. When NSHS adopts a temporary standard, the protocol is tested and eventually recommended if the standard proves reliable. Although it is not clear from the record, the NSHS's current standard may have been subject to some peer review. See, e.g., Pl.'s Resp. Ex. M 66:23-67:4. Even if it has, there is no evidence of what the results of those studies were. Regardless, however, it has not crossed the threshold from temporary to an adopted standard and it is therefore not a standard protocol that has been deemed reliable.

[17]As the Daubert Court recognized, "[s]ome propositions . . . are . . . of too limited interest to be published." Daubert, 509 U.S. at 593. Therefore, although publication is relevant to the inquiry, it is not dispositive. Id. at 594.

less heavily in the present case due to the simple fact that this kind of information is not available for the detection of BLS in bell pepper seeds. The Court therefore must look primarily to other aspects of Dr. Gitaitis's methodology to determine whether it is sufficiently reliable.

### 1. The Existence of Standards Controlling the Technique's Operation

In Daubert, the Court held that one factor that bears on the question of reliability is "the existence and maintenance of standards controlling the technique's operation." Daubert, 509 U.S. at 483. In the present case, although the sweat box and dome tests on which Dr. Gitaitis's grow-out were modeled were relatively simple procedures, standards did nonetheless exist to govern them, and Dr. Gitatis described them in his testimony and reports. Those standards included planting the seeds, covering the containers, growing them under lights, and making isolations of any legions once they were discovered. They also included contamination prevention steps during the grow-out and culturing stages. Dr. Gitaitis performed this "standard seed assay test" in a "professional manner in accordance with pathological scientific standards." Jones Aff. ¶ 8.

### 2. "Generally Accepted" Methodology and Extrapolation

General acceptance of a methodology among the scientific community weighs in favor of admission of expert testimony, although it is not a prerequisite. Daubert, 509 U.S. at 594. The grow-out test is a generally accepted methodology for use in the detection of watermelon fruit blotch and halo bean blight. Dr. Gitaitis took these

methodologies, which are known to be effective in these other contexts, and extrapolated to conclude that they would be effective in the detection of XCV in bell peppers.

As the Supreme Court has noted, experts often use existing data to extrapolate and form conclusions.  <u>Gen. Elec. Co. v. Joiner</u>, 522 U.S. 136, 146 (1997).  This practice is acceptable, as long as the gap between the data and the opinion is not "too great" and something beyond the mere *ipse dixit* of the expert connects them.  <u>Id.</u>  In this case, extrapolating from the halo bean blight and watermelon fruit blotch methodologies to form a procedure for detecting XCV in bell peppers was not an unwarranted analytical leap.  Experts from both sides agree that it is common practice to use a test from one seed as a starting point to develop tests for other seeds.  Dr. Gitaitis provided an explanation of the test and how it would work effectively in bell peppers.  The Court therefore finds that the grow-out was a reasonable adaptation of a generally accepted standard seed assay.

### 3. "Hired Gun" Research and Conscientiousness of Litigation Consulting Compared to Regular Research

Two factors that the Advisory Committee Notes include in the <u>Daubert</u> analysis are whether the expert plans to testify regarding research conducted for the purpose of litigation only and whether the expert is being as careful in his paid litigation consulting work as he would be in his regular practice.  Fed. R. Evid. 702 advisory committee's note.  In this case, the Court finds it "very significant" that the

expert is testifying regarding research conducted independent of the litigation.  <u>See</u> <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u> (<u>Daubert II</u>), 42 F.3d 1311, 1317 (9th Cir. 1995).  Dr. Gitaitis performed the research in this case in his function as a university researcher, not as a paid litigation consultant.  The Court therefore easily concludes that Dr. Gitaitis exercised the same degree of care in this research as he does in his other research.  Furthermore, even a witness for Clifton acknowledged Dr. Gitaitis's skill as a scientist and expressed his "deep respect for the research and contributions he has made to the vegetable industry."  Pl.'s Resp. Ex. P ¶ 4.  This factor therefore weighs heavily in favor of finding his testimony reliable.

The challenging parties have launched an attack on Dr. Gitiatis's experiment as "designed specifically for this litigation."  This argument is without merit, however, since the only testimony regarding  the purpose of the grow-out was that Dr. Gitaitis performed it as part of his work as a researcher for UGA through UGA's extension program, which offers "expertise [to growers] to solve problems that they are encountering.  Dep. Gitaitis 13:8-14:1.  The service is performed in the public interest, not to advance private litigation.  Furthermore, the investigation in this case occurred well before the litigation ensued.


### 4.  Accounting for Obvious Alternative Explanations

Clifton targets Dr. Gitaitis's "inherently biased" investigation, alleging that his sole goal was to prove the Stiletto seed was the source of the infection.  It contends

that Dr. Gitaitis's failure to take into account other possible explanations for the occurrence of BLS demonstrates this bias. A closer look at this argument and the facts of the case, however, demonstrate the fallacy of this logic.

When an expert eliminates an alternative hypothesis, that elimination "must be founded on more than 'subjective beliefs or unsupported speculation.' " <u>Clausen v. M/V NEW CARISSA</u>, 339 F.3d 1049, 1058 (9th Cir. 2003) (quoting <u>Claar v. Burlington N. R.R. Co.</u>, 29 F.3d 499, 502 (9th Cir. 1994)). Although the expert must account for obvious alternative explanations, <u>J & V Dev., Inc. v. Athens-Clark County</u>, 387 F. Supp. 2d 1214, 1226 (M.D. Ga. 2005), he does not have to eliminate every other possible cause. <u>Jahn v. Equine Svcs., PSC</u>, 233 F.3d 382,390 (6th Cir. 2000); <u>see also</u> <u>Ambrosini v. Labarraque</u>, 101 F.3d 129, 140 (D.C. Cir. 1996) (reasoning that the fact that some causes have not been eliminated goes to weight, not admissibility).

Dr. Gitaitis visited LTF to investigate the source of BLS. His observations led to conclusions that were based on his years of experience and the instinct he has developed over those years. As the Eleventh Circuit has acknowledged, "experience in a field may offer another path to expert status" when it is clear " 'how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts.' " <u>Frazier</u>, 387 F.3d at 1260-61 (quoting Fed. R. Evid. 702 advisory committee's note). Dr. Gitaitis testified that he focused on the Stiletto seed as the source of the BLS due

to the pattern of the infection, the distance between the field and the greenhouse, and the stage and severity of the BLS in the Hungarian peppers and the Stiletto peppers.  He explained the idea of an infection gradient and the effect of BLS on peppers when it is contracted at different life stages.  Finally, he applied his knowledge regarding these things to the facts as he observed them, and he explained why these factors led him to exclude the Hungarian peppers or an endemic strain of bacteria as the source of the infection.  He therefore accounted for obvious alternative explanations using his experience and knowledge instead of through experimentation, and this method is sufficiently reliable under Rule 702.

### 5.  Field of Expertise

If the field of expertise the expert claims is known to reach reliable results for the kind of opinion offered, then that factor weighs in favor of finding the testimony reliable.  In this case, the field of expertise is plant pathology; the kind of opinion offered is an opinion regarding the source of bacteria in plants.  Although no specific evidence was offered on this point, the Court notes that UGA maintains a plant pathology program and that farmers regularly rely on plant pathology experts to diagnose plant pathogens.  This factor therefore weights in favor of finding the testimony reliable.

### 6.  Other Objections

The Court finds that the remaining arguments that Clifton asserts lack merit. It attacks Dr. Gitaitis's expert testimony because the initial investigation was

inconclusive and allegedly "did not adhere to principles of good science," his grow-out test results could not be replicated, he did not follow a written protocol in the execution of the test, there was a risk of contamination of the seeds, and he disregarded evidence of Defendant's pre- and post-marketing testing. The Court addresses each of these concerns in turn.

(i) Initial Investigation

The attacks on Dr. Gitaitis's initial investigation mischaracterize his preliminary observations and findings. As previously explained, Dr. Gitaitis developed what he characterized as a suspicion that the Stiletto seeds were the source of the inoculum. This suspicion was based on his experience and observations of the infections. As a result, his first hypothesis was that the Stiletto seeds were the source, and he subsequently undertook to test that hypothesis. The hallmark of scientific knowledge is the scientific method, which requires the development of hypotheses and attempts to disprove them through experimentation. See Daubert, 509 U.S. at 593; Bynum, 3 F.3d at 774. Instead of disproving his hypothesis that the Stiletto seed was the source of the XCV, however, Dr. Gitaitis's experiment confirmed it. He therefore did not undertake to test other hypotheses. He also testified that had he ruled out the Stiletto seeds as the source, he would have considered other theories. His research was therefore not a biased, single-minded quest to prove Stiletto seeds were the culprit behind the BLS outbreak, but rather an informed process of elimination consistent with the scientific method.

41

(ii) Consideration of Pre- and Post-Marketing Tests

Clifton further asks the Court to consider the results of Syngenta's testing of its own seeds, which produced negative results for the presence of XCV bacteria. This, it argues, is evidence that Dr. Gitaitis's methodology was flawed. It cites McClain for the proposition that "when the opinions clearly demonstrate something about the expert's methodology . . . the court can draw inferences about the methodology from the opinions." McClain, 401 F.3d at 1248 n.8. Clifton take this language out of context, however.

McClain involved a toxic tort claim that turned on the issue of causation. Id. at 1239. The challenged expert provided testimony that *any* dose of the chemical compound at issue in the case was "too much." Id. at 1242-43. A basic concept of toxicology, however, is that individuals can be safely exposed to toxic substances up to a threshold level. Id. at 1242. Therefore, the expert's conclusion itself contradicted basic principles of the methodology in the field of toxicology. Id. at 1243.

The present case is readily distinguishable from the facts in McClain. Nothing about Dr. Gitaitis's conclusions call into question his methodology. The Court has no discretion to exclude expert testimony based on the fact that the results are favorable or unfavorable to one of the parties. As the Daubert Court cautioned, the focus of the reliability inquiry is solely on the methodology, not the outcome. Daubert, 509 U.S. at 595. There are reasonable explanations for the difference in

outcomes of the tests, to which Dr. Gitaitis and Dr. Jones testified. Whether Syngenta's tests deserve more weight than Dr. Gitaitis's grow-out is a matter for the jury.

(iii) Replication

Clifton next argues that Dr. Gitaitis's methodology is unreliable because an independent lab could not replicate his findings using the same methodology. The Daubert Court was careful, however, to distinguish evidentiary reliability from the concept of scientific reliability. Scientific reliability refers to the application of a principle or theory producing consistent results; evidentiary reliability is based upon scientific validity, i.e., the principle is trustworthy and "supports what it purports to show." Id. at 590 n.9. Clifton's replication objection is based on the grow-out failing to produce consistent results and is therefore based on a lack of scientific reliability, even though all that Daubert requires is evidentiary reliability. Daubert does not mandate that Dr. Gitaitis's test results be reproduced as a prerequisite to admissibility. Dr. Gitaitis provided a written protocol that allowed other labs to repeat his experiment; the fact that those labs produced different results is an argument that goes to the weight of the evidence but does not prevent it from being introduced as evidence at trial.

(iv) Written Protocol

Clifton contends that the failure to commit the protocol to writing before executing the test renders the methodology unreliable. The Court of Appeals of the

United States for the Eight Circuit addressed this concern in <u>United States v. Boswell</u>. 270 U.S. 1200 (8th Cir. 2001). The court acknowledged that the researcher had followed no written protocol, but that he had provided testimony describing the method and procedures he used. <u>Id.</u> at 1205. It held that the lack of a written protocol did not prove that "there were significant deficiencies in the protocol and procedure" that the challenged expert used. <u>Id.</u> The court therefore concluded that the failure to use a written protocol went to the weight of the evidence and not the admissibility. <u>Id.</u>

In the present case Clifton does not argue that the protocol followed was different from the written protocol that Dr. Gitaitis and Sanders provided. It also does not argue that the general lack of documentation during the experiment had any identifiable effect on the accuracy of the experiment. Instead, it seems to suggest that the lack of a written protocol indicates that Dr. Gitaitis and Sanders were not following any protocol at all, and were instead engaged in sloppy research and haphazard execution of the experiment. There is certainly no evidence in the record that supports such a theory. In fact, the testimony of Dr. Gitaitis, Sanders, and Dr. Jones, along with Dr. Gitaitis's extensive research experience and professional accomplishments, indicate that the research performed under Dr. Gitaitis's direction is performed in a professional manner. Dr. Gitaitis's testimony is therefore admissible despite his failure to commit the protocol for the grow-out to paper before conducting the test.

### (v) Contamination

As detailed above, steps were taken to prevent contamination, including the physical location of the grow-out, the use of new materials, covered trays, and gloves, and the sterile plating of extracted samples. The only omissions of which Clifton complains were the failure to sterilize the cans of seeds before opening them and the fact that Dr. Gitaitis did not personally observe his assistant's contamination prevention procedures. Rule 702 certainly does not require a lab's head researcher to personally observe contamination prevention procedures. The precautions Sanders took made it "highly improbable" that contamination occurred. Jones Aff. ¶ 6.a.ii. Clifton is free to argue at trial that contamination occurred during the experiment, but the Court finds that this slight possibility does not render the testimony regarding the grow-out inadmissible.

### C. Conclusion

The Court finds that the testimony of Dr. Gitaitis meets all the admissibility standards of Rule 702, including reliability. As the United States Court of Appeals for the Third Circuit stated, a proponent of expert testimony does "not have to demonstrate to the judge by a preponderance of the evidence that the assessments of their experts are correct, they only have to demonstrate by a preponderance of evidence that their opinions are reliable. . . .The evidentiary requirement of reliability is lower than the merits standard of correctness." In re Paoli R.R. Yard PCB Litigation, 35 F.3d 717, 744 (3d Cir. 1994). Any deficiencies in Dr. Gitaitis's expert

opinion are properly addressed through "[v]igerous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof" to the jury, not by excluding his testimony altogether. See Daubert, 509 U.S. at 595. The Motion in Limine is therefore denied.


## V.  CONCLUSION

Syngenta's Motion for Summary Judgment is granted and the claim against it is dismissed. Clifton's Motion for Summary Judgment is denied as moot with regard to the strict liability claim, and denied with regard to the breach of implied warranty claim. In addition, the Motion in Limine to exclude Dr. Gitaitis's testimony is denied. Plaintiff's Motion for Partial Summary Judgment is granted in part and denied in part.

The Clerk of Court is directed to set this case for trial as soon as practicable.


**SO ORDERED**, this the 26th day of March, 2008.


_s/  Hugh Lawson_
**HUGH LAWSON, Judge**

tch